UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
     Plaintiff,

     v.                                    MAGISTRATE JUDGE NO.
                                          10-02214-MBB
KIMBERLY CRONIN,
     Defendant.

**MEMORANDUM AND ORDER RE:**
**MOTION TO SUPPRESS AS TO KIMBERLY CRONIN**
**(DOCKET ENTRY # 5)**

**October 12, 2012**

**BOWLER, U.S.M.J.**

     Pending before this court is a motion to suppress evidence

from a motor vehicle stop by Park Ranger Patrick Seeley

("Seeley") of a vehicle driven by Kimberly Cronin ("defendant").

(Docket Entry # 5).[1]  Defendant moves to suppress observations of

defendant and results of examinations derived from the motor

vehicle stop.  (Docket Entry # 5).  The events leading up to and

including the motor vehicle stop occurred in and around the

Charlestown Navy Yard ("the Park") on October 9, 2010.[2]  (Docket

Entry # 13).

---

     [1]  On September 13, 2012, this court denied a similar,
subsequently filed motion to suppress.  (Docket Entry # 14).  In
the motion, defendant argued that Seeley "ordered her to exit her
vehicle without probable cause, reasonable suspicion or any other
justification or power."  (Docket Entry # 14).
     [2]  The Charlestown Navy Yard is part of the Boston National
Historical Park.  See 16 U.S.C. § 410z.

Having reviewed the papers and conducted an evidentiary hearing on May 15 and 29, 2012, this court finds that Seeley conducted:  (1) an investigation pursuant to 16 U.S.C. § 1a-6(b)(3) of improper display of lights; (2) a Terry[3] stop to investigate the possibility of defendant's operation under the influence of alcohol; and (3) a de facto arrest of defendant for operating under the influence.  Under the totality of the circumstances, the arrest was reasonable.

## PROCEDURAL BACKGROUND

Violation Numbers 1379165 and 1379166, respectively charging defendant with operating under the influence of alcohol (36 C.F.R. § 4.23(a)(1)) and refusal to submit to a chemical test (36 C.F.R. § 4.23(c)(2)), were filed on October 9, 2010.  (Docket Entry # 1).  On April 19, 2011, defendant filed the motion to suppress evidence derived from her arrest arguing that she was never within an area subject to federal jurisdiction thereby precluding a lawful arrest by Seeley.  (Docket Entry # 5).  The United States of America ("the government") opposes the motion arguing that she committed a traffic violation within the boundaries of the Park thus permitting Seeley to investigate the violation.  (Docket Entry # 9).

---

[3]   Terry v. Ohio, 392 U.S. 1 (1968).

On May 15 and 29, 2012, this court conducted the aforementioned evidentiary hearing to determine whether the motor vehicle stop was a violation of the Fourth Amendment.  At the May 15, 2012 hearing, the government called Seeley and the defense called defendant as witnesses.  On May 29, 2012, the defense called Peter Medeiros ("Medeiros") as a witness.

<u>FACTUAL BACKGROUND</u>

On the morning of October 9, 2010, between 1:30 a.m. and 2:00 a.m., defendant picked Medeiros up in her automobile in the Causeway Street area of Boston.  At 1:30 a.m., Medeiros testified he called defendant's cellular telephone, asking her to come get him and she arrived to pick him up within five to ten minutes. Defendant testified that she was working at the Waterfront Café until 1:45 a.m. or 2:00 a.m.  Medeiros believed defendant was wearing her work clothes.

Thereafter, defendant drove toward her home on Sackville Street in Charlestown.  The parties dispute the route taken. Defendant and Medeiros testified that they progressed from the Charlestown Bridge immediately onto Chelsea Street, continuing until Seeley stopped the car and pulled it over on Vine Street. Medeiros and defendant further testified they neither drove through an area under federal jurisdiction, nor stopped for drinks on the drive to defendant's home.  While traveling, they

3

bumped another car or curb and Medeiros heard one of the tires
pop.  Medeiros testified that the popped tire was the left, rear
tire.  Defendant continued driving on the damaged tire as they
were approximately one half mile from their destination.  They
planned to change the damaged tire the following morning.  They
drove on the deflated tire until Seeley pulled them over on Vine
Street.

Seeley has been a National Park Ranger in the Park for more
than two and one half years and an employee of the National Park
Service for more than three and one half years.  Seeley has had
extensive training in the handling of operating under the
influence ("OUI") offenses including:  (1) Type 2 National
Service Academy at the University of Massachusetts in Amherst;
(2) a second academy training covering driving under the
influence; (3) four months of training at the Pinal County,
Arizona Sheriff's Department emphasizing driving under the
influence detection; and (4) a 16 week training course at the
Federal Law Enforcement Training Center in Glynco, Georgia which
covered OUI for one and one half weeks.  Seeley has made between
20 and 35 arrests for OUI during his tenure with the National
Park Service.

On the morning of October 9, 2010, Seeley was alone and
parked in his marked control vehicle in the Park.  Seeley first

took notice of defendant's vehicle as it turned left from First Avenue onto Fifth Street, towards Chelsea Street on routine patrol.  Seeley testified he saw the blue Honda sedan traveling in the same direction without illuminated taillights.  (Docket Entry # 1, Violation No. 1379165; Docket Entry # 13, pp. 6-7).  Defendant testified this is not possible because not only was she not in the Park that morning, but her headlights and taillights automatically activate in the dark.

While within the boundaries of the Park, Seeley activated the blue lights on his vehicle in response to the sedan's lack of lights.  Defendant continued to drive.  With his blue lights activated, Seeley began to follow the sedan as it traveled 200 to 300 feet further down Fifth Street, took a right onto Chelsea Street for 300 to 400 feet and a left onto Vine Street, before coming to a stop at 20 Vine Street, a distance of 600 to 700 feet.  When defendant turned onto Chelsea Street, the vehicle left federal jurisdiction.  Defendant testified that she never turned onto Fifth Street, she pulled over onto Vine Street upon seeing the flashing blue lights behind her on Chelsea Street and she denies that her lights were off.

Defendant's failure to stop after Seeley activated his lights constitutes the criminal offense of disobeying a lawful order, for which no charge has been brought against defendant nor

is there any record of the offense in Seeley's reports. At the time of the vehicle stop, Seeley had made no observations about defendant's driving.

Upon his approach to the vehicle, Seeley noticed that one tire was completely deflated. Contrary to Medeiros' testimony, Seeley testified that the flat tire was the left, front tire. (Docket Entry # 1, Violation No. 1379165). Seeley spoke with the driver, identified as defendant, and explained the reason he pulled her over and asked for her license and registration. At this time, Seeley observed a strong odor of alcohol coming from the vehicle. (Docket Entry # 1, Violation No. 1379165). He initially assumed this to be from the passenger, Medeiros.

When Seeley asked where she was coming from, defendant responded that she had just left work, picked up her passenger and was driving to her house. (Docket Entry # 13, p. 15). Defendant initially testified she had just left work and picked up her passenger when Seeley stopped her. Later in the hearing, defendant testified that she went home, changed and drank a beer before picking up Medeiros. Before defendant exited the vehicle, Seeley asked if she had been drinking, she said she had not. (Docket Entry # 13, p. 31).

Seeley explained to defendant that she was not to drive with the flat tire and gave her the option of changing the tire or

towing the car.  She and Medeiros then stepped out of the vehicle and Medeiros began changing the tire.  (Docket Entry # 13, pp. 15-16).  As defendant exited the vehicle, Seeley observed that she "used her left hand to assist herself in balancing" and had bloodshot, glassy eyes.  (Docket Entry # 13, p. 32; Docket Entry # 1, Violation No. 1379165).  Defendant was wearing high heels.

At this point, Seeley observed that defendant was "swaying back and forth" and that "[s]he needed to use the light pole to keep herself balanced and upright."  (Docket Entry # 13, p. 18).  While Medeiros changed the tire, Seeley observed an odor of alcohol coming from defendant.  (Docket Entry # 1, Violation No. 1379165).  Defendant testified that a consequence of being a bartender is that she always smells of alcohol after work.  Seeley asked defendant again if she had been drinking, to which she responded that she had about three beers.  (Docket Entry # 13, p. 33).  Defendant testified that she drank one beer when she got home from work.  When asked if she felt intoxicated, Seeley testified that, "She said she did feel intoxicated and that she shouldn't be driving."  (Docket Entry # 13, p. 33).  Seeley then explained his observations to her and said that he wanted to perform a horizontal gaze nystagmus test ("HGN") on her.  She "hit six out of six clues" on the HGN, indicating that she was under the influence.  (Docket Entry # 13, p. 20).

Seeley then performed, and defendant failed, two more field sobriety tests:  the "one leg stand" and the "walk and turn." (Docket Entry # 1, Violation No. 1379165).  On the one leg stand test, defendant had to put her foot on the ground once or twice in a period of 30 seconds.  On the walk and turn test, defendant started early, failed to stay on the line on one of the 18 steps taken and may have failed to walk heel to toe.  (Docket Entry # 13, pp. 20-22).  Seeley is trained to perform all three of these tests.  (Docket Entry # 13, p. 19).

Although Seeley made no observations about defendant's speech during the first 30 minutes of the stop, defendant was handcuffed and placed under arrest.  Seeley then transported defendant in his vehicle to the prisoner processing area to run her criminal record, check for outstanding warrants, obtain fingerprints, take photographs and conduct a breath test. Notwithstanding Seeley's warning that refusal would result in an additional charge, defendant did not submit to the breath test. (Docket Entry # 1, Violation No. 1379166).

<u>DISCUSSION</u>

Defendant moves to suppress "all evidence . . . derived from a motor vehicle stop taken in violation of the defendant's rights pursuant to the Fourth Amendment."  (Docket Entry # 5). Defendant contends that Seeley could not make an arrest because a

8

National Park Ranger has no statutory authority to make an arrest

or investigate a crime because no crime against the United States

had occurred.  (Docket Entry # 10).  Defendant relies on 16

U.S.C. § 1a-6(b) and states that:

> United States Park Rangers may:  (1) "make arrests without
> warrant for any offense against the United States committed
> in his presence" so long as "such arrests occur within that
> system or the person to be arrested is fleeing therefrom to
> avoid arrest" and (2) "conduct investigations of offenses
> against the United States committed in that system."

(Docket Entry # 10, p. 2 (quoting 16 U.S.C. § 1a-6(b)).

Defendant asserts that her arrest was unlawful under this

statute because she never entered the Park or other federal

territory on the morning of October 9, 2010.  Consequently, she

could not have committed an offense against the United States

inside that system granting Seeley the authority under 16 U.S.C.

§ 1a-6(b) to arrest her.

The government submits that:  (1) the stop of defendant's

vehicle "was within the statutorily created law enforcement

powers of the ranger, and was constitutionally permitted" because

it was "based on a criminal violation occurring and personally

observed by a ranger within the [P]ark"; and (2):

> the ranger's limited arrest authority is not implicated in
> this case because Ranger Seeley did not arrest [defendant];
> she was temporarily detained under <u>Terry v. Ohio</u>, 392 U.S. 1
> (1968), and all action taken was reasonably related in scope
> to the circumstances which justified the interference in the
> first place.

9

(Docket Entry # 9, p. 3).

I. <u>Initial Vehicle Stop</u>

Pursuant to 16 U.S.C. § 1a-6(b), rangers have both the power to:  (1) "make arrests without warrant for any offense against the United States committed in his presence" when the arrest occurs in the federal territory, or if "the person to be arrested is fleeing therefrom to avoid arrest"; and (2) the power to "conduct investigations of offenses against the United States" that occurred in federal territory.  16 U.S.C. § 1a-6(b)(1) & (3).  The investigative power is not subject to geographic limitation.  <u>See</u> <u>United States v. Smith</u>, 713 F.2d 491, 494 (9th Cir. 1983); <u>United States v. Strasnick</u>, 2008 WL 2389789, *2 (D.Mass. June 10, 2008); H.Rep. No. 94-1569, 94th Congress, 2nd Session 18.  A park ranger may pursue a motorist into non-federal territory if the ranger possesses reasonable suspicion or probable cause to believe that the motorist committed an offense within federal territory.  <u>U.S. v. Ryan</u>, 729 F.Supp.2d 479, 485 (D.Mass. 2010).

Furthermore, the investigative power of a ranger extends to traffic violations because state traffic laws are applicable in the Park.  <u>See</u> 36 C.F.R. § 4.2(a) ("[u]nless specifically addressed by regulations in this chapter, traffic and the use of vehicles within a park area are governed by State law").  Under

10

Massachusetts law, a law enforcement officer is justified in
stopping a vehicle when that vehicle is operating without using
its taillights.  Mass. Gen. L. ch. 90, § 7; accord Commonwealth
v. Santana, 649 N.E.2d 717, 719 (Mass. 1995) ("'where the police
have observed a traffic violation, they are warranted in stopping
a vehicle'" that has a broken taillight).

Seeley observed the improper display of lights on Fifth
Street east of Chelsea Street, an area within federal
jurisdiction.[4]  (Docket Entry # 13, pp. 8-9).  After activating
his blue lights within the Park, Seeley permissibly followed
defendant beyond federal jurisdiction while investigating the
violation.  U.S. v. Ryan, 729 F.Supp.2d at 485.

Alternatively, Seeley exercised his authority to arrest
defendant under 16 U.S.C. § 1a-6(1).  This statute authorizes an
arrest "if the person to be arrested is fleeing [from the
jurisdiction] to avoid arrest."  In order to determine whether a
suspect is fleeing to avoid arrest, district courts have
considered the location at which the ranger activates the cruiser
lights.  See United States v. Jones, 428 F.Supp.2d 497, 501
(W.D.Va. 2006) (finding the defendant did not "flee" where the
rangers "did not activate their blue lights, thereby initiating

---

[4]   Seeley is more reliable in light of the inconsistency in
defendant's testimony with regard to going home before picking up
Medeiros.

11

the stop, until after they had traveled outside of the Park");
United States v. Fox, 147 F.Supp.2d 1008, 1009 (N.D.Cal. 2001)
(finding the defendant fled when ranger signaled the defendant to
pull over by activating lights within the park but the defendant
drove an additional 200 yards outside the park before pulling
over).  Here, Seeley activated his blue lights inside the Park
and signaled defendant to pull over while she was traveling on
Fifth Street, within federal territory, but defendant drove an
additional 600 feet outside the Park before pulling over.
(Docket Entry # 13, pp. 10-11).  Therefore, Seeley permissibly
stopped defendant beyond the Park boundary because she fled to
avoid arrest.

"The Supreme Court has long viewed the typical traffic stop
to 'resemble, in duration and atmosphere, the kind of brief
detention authorized in Terry.'"  United States v. Fernandez, 600
F.3d 56, 59 (1st Cir. 2010) (quoting Berkmerer v. McCarty, 468
U.S. 420, 439 (1984)).  "Like the reasonable suspicion that
criminal activity is afoot in the Terry context, the detection of
a traffic violation permits officers to effect a limited seizure
of the driver and any passengers consistently with the Fourth
Amendment."  Id. (citing Arizona v. Johnson, 555 U.S. 323, 788
(2009)); see also United States v. Chaney, 584 F.3d 20, 24 (1st
Cir. 2009) ("[a] traffic stop constitutes a seizure . . . and

thus must be supported by reasonable suspicion that a traffic violation has occurred"). Several courts have held that, "There is no reason to believe that Congress intended the park police officers' authority to investigate be construed so narrowly as to exclude Terry stops." United States v. Smith, 713 F.2d at 494; see, e.g., United States v. Strasnick, 2008 WL 2389789 at *3 ("[b]ecause Ranger LaMere acted within his investigative powers pursuant to § 1a-6(b)(3), for which there is no geographic limitation, he was authorized to stop Strasnick outside of the park to investigate the traffic violation . . . that occurred inside of the park").

Here, Seeley saw defendant's vehicle operating with an improper display of lights while within federal jurisdiction. (Docket Entry # 13, p. 8). This observation gave rise to a reasonable suspicion, if not probable cause, that a traffic violation had occurred within federal jurisdiction thereby justifying a traffic stop. Furthermore, Seeley's motivation for stopping defendant (investigation of a traffic violation) was permissible. See Whren v. United States, 517 U.S. 806, 810 (1996) (stating that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"). Therefore, the traffic stop off of Park property was permissible as part of Seeley's

investigation of the traffic violation that took place in the
Park under 16 U.S.C. § 1a-6(b)(3) or, alternatively, as an arrest
authorized by defendant's attempt to flee under 16 U.S.C. § 1a-
6(b)(1).

II.  Constitutionality of Terry Stop

Determining the reasonableness of a Terry stop involves a
two step inquiry.  See United States v. Caine, 517 F.Supp.2d 586,
588 (D.Mass. 2007) (citing United States v. Walker, 924 F.2d 1, 3
(1st Cir. 1991)).  "To work the calculus of reasonable suspicion
in the context of a traffic stop, an inquiring court must ask
whether the officer's actions were justified at their inception,
and if so, whether the officer's subsequent actions were fairly
responsive to the emerging tableau."  United States v. Chhien,
266 F.3d 1, 6 (1st Cir. 2001).  The "determination of whether the
stop was justified at its inception depends on the totality of
circumstances confronting the [ranger]."  United States v.
Trullo, 809 F.2d 108, 111 (1st Cir. 1987).  The analysis involves
looking at "the circumstances originally warranting the stop,
informed by what occurred, and what [the officer] learned, as the
stop progressed."  United States v. Chhien, 266 F.3d at 6.

As previously stated, Seeley had reasonable suspicion to
initiate the traffic stop to investigate the improper display of
lights, a traffic violation.  During the stop, Seeley noticed

14

that in addition to the unilluminated taillights, defendant's vehicle was operating with the headlights off and a flat tire. (Docket Entry # 13, pp. 13-14).  Seeley also noticed a strong smell of alcohol coming from the vehicle.  (Docket Entry # 13, p. 15).  He, permissibly, had the passengers exit the vehicle.  See Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) (once the "motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment").

After a short period of time, Seeley suspected that something more than a traffic violation was involved.  "The first part of the [Terry] inquiry is satisfied if [the park ranger] can point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted."  United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).  The facts available to Seeley which warranted an investigatory stop included:  (1) as defendant exited the vehicle she needed to balance herself with her left hand; (2) she had bloodshot, glassy eyes; (3) she appeared to sway back and forth as Medeiros changed the tire; (4) she struggled to stand upright without the aid of a light post; and (5) she admitted to drinking three beers.

15

In addition, a park ranger is permitted to "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well allude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002).  Seeley concluded that he had reasonable suspicion to believe that defendant was operating her vehicle under the influence of alcohol within the federal jurisdiction.  Defendant's physical signs of being under the influence of alcohol, the smell of alcohol and her admission of consuming alcohol allowed Seeley to reasonably reach this conclusion.  See Terry v. Ohio, 88 U.S. at 21 ("objective standard:  would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?").

The Terry stop continued as Seeley administered several field sobriety tests to defendant "to quell or confirm [his] suspicions." Klaucke v. Daly, 594 F.3d 20, 25 (1st Cir. 2010). Field sobriety tests are reasonable during a Terry stop if the park ranger has reasonable suspicion to support his belief that the driver is impaired.  See, e.g., United States v. Maher, 454 F.3d 13, 18 n.5 (1st Cir. 2006); United States v. Caine, 517 F.Supp.2d 586, 589-90 (D.Mass. 2007).  The field sobriety tests led Seeley to conclude that defendant had both operated her

vehicle under the influence of alcohol within the Park and was
too impaired to operate her motor vehicle safely.

III.  <u>Arrest</u>

After Seeley determined that defendant was too impaired to
operate a vehicle, Seeley placed defendant under arrest.  (Docket
Entry # 13, p. 25).  The government argues that defendant was not
arrested but rather was processed at the prisoner processing area
located within the Park as much as was necessary to investigate
an OUI offense.  (Docket Entry # 9).  Defendant contends she was
arrested.  (Docket Entry # 10).

A <u>Terry</u> stop to investigate criminal behavior "permits
officers to 'stop and briefly detain a person for investigative
purposes,' . . . and 'diligently pursue[] a means of
investigation . . . likely to confirm or dispel their suspicions
quickly.'"  <u>United States v. Trueber</u>, 238 F.3d 79, 91-92 (1st
Cir. 2001) (citing <u>United States v. Sokolow</u>, 490 U.S. 1, 7
(1989)).  In this case, after Seeley performed field sobriety
tests on defendant, he determined that she had been operating her
vehicle under the influence of alcohol within the Park.  What
took place after the field sobriety tests transformed the
encounter from a permissible <u>Terry</u> stop into the realm of an
arrest.

The government argues that defendant was not subject to an arrest because "an arrest would have required an initial appearance before a United States Magistrate Judge 'without unnecessary delay.'" (Docket Entry # 9, p. 9). As this did not happen, so the argument goes, defendant could not have been arrested. This court agrees this was not a formal arrest but finds it was a de facto arrest.

"There is no scientifically precise formula that enables courts to distinguish between investigatory stops . . . and . . . 'de facto arrests.'" United States v. Zapata, 18 F.3d 971, 975 (1ˢᵗ Cir. 1994). "In cases regarding the scope of a Terry stop, we examine 'whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."'" United States v. Maguire, 359 F.3d 71, 77 (1ˢᵗ Cir. 1996). The "relevant inquiry is how a reasonable [person] in the suspect's shoes would have understood [the] situation." Berkmerer v. McCarty, 468 U.S. at 442.

"A valid investigatory stop can become an unconstitutional interference with a suspect's Fourth Amendment rights as police conduct becomes overly intrusive and amounts to an arrest." Shah v. Holloway, 2009 WL 2754406, *9 (D.Mass. Aug. 20, 2009). "[A]mong the most well-defined limitations [on police conduct during an investigatory stop] is that a suspect may not be

removed to a police station without his consent."  Shah v.
Holloway, 2009 WL 2754406 at *9; see Kaupp v. Texas, 538 U.S.
626, 630 (2003) ("involuntary transport to a police station for
questioning is 'sufficiently like arres[t] to invoke the
traditional rule that arrests may constitutionally be made only
on probable cause'"); Dunaway v. New York, 442 U.S. 200, 212-13
(1979) ("the detention of petitioner was in important respects
indistinguishable from a traditional arrest" where "he was . . .
transported to a police station, and placed in an interrogation
room"); see also Flowers v. Fiore, 359 F.3d 24, 34 (1st Cir.
2004) (holding that officers involved "acted reasonably in
dispelling [their] suspicion throughout the detention" and
finding it "noteworthy that the officers never relocated Flowers
to a station house or detention area").  Probable cause for an
arrest can be obtained from field sobriety tests done by a police
officer.  See, e.g., United States v. Strasnick, 2008 WL 2389789
at *4 ("odor of alcohol . . ., [Strasnick's] impaired speech, and
the results of the breath test and field sobriety tests
indisputably provided [the arresting Park Ranger] with probable
cause for the OUI offense").

Defendant was removed from the scene of the initial stop and
brought to the prisoner processing area within the Park by
Seeley.  Once there, Seeley ran her criminal record and checked

for outstanding warrants.  He also took her fingerprints, photographs, offered her a breath test and wrote both the probable cause statements and the violations.  After this, she was returned to her residence approximately four hours after the initial stop.  While she was never informed that she was under arrest, defendant believes she was arrested.

Seeley, however, had the authority to make this arrest.  16 U.S.C. § 1a-6(b)(1).  Seeley had probable cause to believe that defendant had been driving while under the influence of alcohol. This occurred in the federal jurisdiction and in Seeley's presence.  Defendant was fleeing to avoid arrest when Seeley stopped her; therefore, the de facto arrest is legal.  See United States v. Fox, 147 F.Supp.2d at 1009.

IV.  Suppression

The issue before this court is whether the evidence derived from this stop and arrest should be suppressed.  "Suppression of evidence . . . has always been our last resort, not our first impulse."  Hudson v. Michigan, 547 U.S. 586, 591 (2006); see also Wong Sun v. United States, 371 U.S. 471, 483 (1963) ("to make effective the fundamental constitutional guarantees of inviolability of the person . . . this court held nearly half a century ago that evidence seized during[, and derived from,] an unlawful search could not constitute proof against the victim of

the search").  An arrest supported by probable cause, however, is considered constitutionally reasonable.  See Virginia v. Moore, 553 U.S. 164, 171 (2008) ("when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt" and "arrest is constitutionally reasonable").

Defendant alleges she was stopped and arrested in violation of the Fourth Amendment and that all evidence flowing from that arrest should be suppressed.  Neither the stop nor the arrest, however, was in violation of the Fourth Amendment.  Seeley witnessed defendant's vehicle driving in federal jurisdiction without the required lights whereupon he activated his police lights and stopped the vehicle.  Based on his subsequent observations of defendant and the results of the field sobriety tests he conducted, Seeley determined he had probable cause to believe defendant had operated her vehicle under the influence of alcohol within the Park.  See, e.g., United States v. Strasnick, 2008 WL 2389789 at *4.  The existence of probable cause made it constitutionally reasonable for Seeley to place defendant under de facto arrest and remove her to the prisoner processing area. Defendant's arguments lack merit based solely on the arguments defendant presents, the arrest and stop of defendant were permissible and the evidentiary fruits need not be suppressed.

## CONCLUSION

For the foregoing reasons, the motion to suppress (Docket Entry # 5) is **DENIED.**

                    /s/ Marianne B. Bowler
                    **MARIANNE B. BOWLER**
                    United States Magistrate Judge